We're going to hear argument now in our second case, Wannamaker-Amos v. Purem. Mr. Murphy, whenever you're ready. Thank you, Judge Thacker. And may it please the Court, for almost seven years, managers at Purem Novi and the number two quality person at corporate tried to protect Carmen Wannamaker-Amos from Javad Hassani. And they did so for a very good reason. She was the best quality engineer at the Spartanburg facility. She served with an unblemished record. And when asked at the 30B6 deposition, Purem Novi admitted that after searching the record, they could find no evidence of any criticism. Well, except for the, she had an unblemished record except for her failures right before she was terminated. Well, that was not during this period. And in fact, that That was not during what period? During the period I'm talking about right here. Right. But the period right before she was terminated, you acknowledge that there were some failures on her part, correct? No. I do not. Did she send the response letter to Hyundai that she was asked to send? To rectify the problem? There is no response that she was asked to send. All right. Well, I think, I thought I read that in the record somewhere, but you go right ahead. You read it in the briefs, Your Honor. And you have a 745 page record in front of you. And the key question to that issue of fact would be, where is the response? On page 13 of the brief, they say that the team developed one. On page 30 of their brief, they say she failed to send the response that was drafted for her. Right. But I don't think you'll see the response in the record. I don't think you'll see a response at all in the record. And that was one of the glaring issues. Now, Okay, go ahead. And she has testified in the record that there was no response to send, that she did not have the parts back from containment at the two locations in Alabama where they would be located. And without those parts, you cannot complete what is called a countermeasure. A countermeasure, we give an example as an exhibit to her declaration, a countermeasure is what Hyundai legitimately wanted. And it was right for them to want that. But as she explained in her declaration, that requires getting the part back. First you inspect it to make sure, yes, there is a defect. Then you look for the inspector paints. For example, in this case, there is a missing pipe. Okay, well, an inspector is supposed to check to make sure there's a pipe there. And the inspector puts their mark on it. Okay, well, who inspected this and why did they put their mark on it? First question is, is the pipe missing? You know, okay, there's a complaint that needs to be observed. Second of all, you have to go through this. Then you have to develop with engineering. It's a multi-departmental task to come up with this countermeasure. Quality engineering doesn't do that by themselves. They have a role in it. So are you relying on pretext evidence here? You're not trying to prove a case of direct evidence of discrimination? That is correct. We are not asserting direct evidence. We are alleging pretext. And specifically, if you look at Judge McDonald's prima facie findings, he says everything I just said. Okay, he makes those factual findings. And then three to four pages later, he doesn't follow those findings. And I think I got you sidetracked on where you wanted to go with your argument initially, which is you were saying that you wanted to talk about the problems with her supervisor, Mr. Hossini. Would you like to talk about that? If I'm done, if I've satisfied your, it's more important to me to get your questions answered. I was specifically asking about direct evidence. Go ahead. Go ahead. You've satisfied my answer. Okay, thank you. So Mr. Hossini claims, well, the quality manager who's over actual quality assurance inspection, and it's an important distinction to understand, my client's not in charge of inspecting the parts or quality insurance. Her job is to help set up the systems that then production and quality assurance to report to the quality manager. I think that what I'm interested in is, you know, your argument is that it was pretext that all their allegations that she somehow was not doing her job was pretext for the real reason, which was race and gender discrimination. So I'd like to hear your argument as to the evidence of race and gender discrimination. Okay, well, the, in addition to the pretext and the prime, a prima facie and a pretext, which create the jury issue of race and sex under Reeves, we have, we have very specific evidence as to why Mr. Hossini doesn't like this lady. Okay, he freely commented to another executive, and this is a rare case where an executive actually comes in testifies for the plaintiff, and you'll note in the record, not one other person, member of management testified in support of Mr. Hossini. The only other member of management who testified was Ms. Shawlock, and she told the story about, she told two stories that are important here. One, she tells the story about the comment where he's criticizing my client, and says, well, you know, those blacks are slow. She also tells a story about how he was, yes, trying to get her fired. Now, we knew that because my client was, you know, heard a speakerphone call where Mr. Hossini, and this was, this was well before any issues arose with Hyundai. On the phone, he's telling the plant manager, well, you're going to fire, you're going to fire Carmen. Now, my client also testified as to how, and Ms. Shawlock also gives another anecdote about how she and other women were called in to fix the messes created by some of the men, and in one instance where she did that, a man who's subordinate to her called her and another woman bitches, and Mr. Hossini wouldn't do anything about that. Ms. Wanamaker-Amos talks about whenever she was in the room, she was the one who had to take notes. If she tried to speak up, he'd shut her down. What about, what about the appellee's argument that these, these comments are, I guess, too remote in time? That's a great point. If I was alleging a hostile environment or direct evidence, as Judge Berner pointed out, that would be a good argument because the stray comment doctrine is really a doctrine about whether something's direct evidence, not whether it's probative. And this court has used somewhat stray comments in the prima facie pretext, McDonnell-Douglas line of cases to say, yes, this is flavor the jury can consider. One example, the Westmoreland case. I've cited others, a DynCorp case, but the Westmoreland case was actually an age case. And this was a post-decision comment by the decision maker saying, you'll be okay, go home and take care of your grandbabies. And this court found that to be evidence a jury could rely on to find age discrimination. So if I were here to say this is a hostile environment race harassment case, no, that wouldn't work. One comment like that wouldn't work. If I were to say that was direct evidence, no, that wouldn't work. But holistically, when you put your prima facie case together with your pretext and all the other circumstantial evidence of intent, you can do that in a McDonnell-Douglas case. So, yes, they want to rely on direct evidence cases or hostile environment cases, but that's not what this is. So in a McDonnell-Douglas type case, those comments count. Can we turn to your client's deposition testimony about the reasons for her termination? Do you think there's any relevance to their deposition testimony where she says she doesn't know why she was terminated? She can't. If she testified, and there's cases from this, when plaintiff comes in and says, I create an issue of fact because I testified he discriminated against me on the basis of sex, those cases have been kicked to the curb every single time by this court, and there's a reason for that. I can't testify as to your thought processes. I can't testify as to your motive. I can only testify as to facts from which a jury can infer motive. So when she, and she quite correctly answered, I can't say why he did what his thoughts were. But when she was asked fact questions, she answered every fact question. And also, if you look at the actual questions that were asked, they're very different from the representations made in the briefs about what the questions were. And we pointed that out in our brief as well. But this is a big issue, Judge Berner, and I'm running into it a lot in my cases where it seems to be a trend of quizzing the plaintiff on the law or quizzing the plaintiff on motive, and if the plaintiff stumbles, they say, ah-ha, the plaintiff admits she can't show that it was sex, or ah-ha, she can't show that it was race. Well, that's not the role of a fact witness. The role of a fact witness is to say he did this to me, he said this to me, I saw this. Did the plaintiff know at the time of her deposition, did she know about these past comments that Mr. Hussaini had made about black people and women? Did they know about that at the time of the deposition? Did she know that? I'm sorry, did the plaintiff know that, ma'am? Had anybody told her about those comments? Is it in her complaint? I will look at that, and I'd be happy to address it. I don't want to misspeak. I believe the answer is yes. I believe my recollection is knowing that from the very beginning, and I believe the Rob and Sherlock affidavit that we obtained was very early in the case, but I would like to confirm that for you so I don't misspeak. All right. Can we turn in your last couple of minutes to comparator evidence? Yes. Are you relying on comparator evidence? To a point, yes, and that's very important, because this is where the goalpost got moved on me. Mr. Hussaini said in his document where he says, I want her fired because he says it resulted in quality complaints. That's what he said, quality complaints. That's why we pointed to the BMW complaints, because while there are arguably two during her tenure, there are, what, hundreds from BMW alone, and nothing was done. And they say we don't discipline for quality complaints. Well, they do when it's a black woman, but it was when it was the white folks. Hundreds of them can go by, and nothing happens. Now, the judge moved the goalpost on me. He said, well, but you didn't show that that was a failure to respond to a customer. Well, I didn't say that because Mr. Hussaini didn't say that. They changed it on me, and it's a little bit like whack-a-mole. You knock down an argument, and a different argument pops up. I responded directly to what Mr. Hussaini said in his document where he said, fire Carmen, and that was it caused quality complaints. And we knew quality complaints were not grounds for discipline. The 30B6 witness agreed with that, and the data shows that. And her complaint alleges that she was fired because of race and gender discrimination, correct? Correct. But when she testified at her deposition, she said she didn't know why she was fired. Is that correct? No, she didn't say she didn't know why she was fired. She said she could not basically speculate as to why he said a certain thing or did a certain thing, and that's absolutely accurate. You cannot require, you cannot say, may I? Yes, please. You cannot have case law that says the plaintiff's speculation is not evidence and doesn't count, but she must speculate to get into the ballgame. Frankly, that's just a contradiction. It doesn't exist in the law now, and certainly should not exist going forward. All right, I understand. Go ahead, Judge Berner. Is there evidence in the record about the makeup of the workforce? I don't believe so, Your Honor. Do you know whether there were other women? I believe I read that she was the only black person under Hussaini's supervision. Do you know whether there are other women under Hussaini's supervision? Well, I think what the record says is there was no black person that reported directly to Mr. Hussain. I don't know that I've ever represented nobody in that whole organization. Remember, he's at the very top, and there's lots of plants. I don't think we ever said that within that organization there were no other black people. We said that he never hired one to work with him, and I think the record reflects she was the only black in the Spartanburg facility. And do we know if there are other women who performed the same duties as she did? Is that in the record? It's on the record, but I would assume over the organization, I think it's safe to say there were probably other women. I think there were other women on the BMW group. I think they're mostly male on the BMW group, but I think there were white women on there too. Thank you. One quick question. Go ahead. But the BMW group did not report. They didn't report to, is it Hussain? Is that his name? Hussaini. Did they report? I mean, because she's using them as comparators. Yes. Did they report to Hussain? After he came down, yes. Everybody, Hussaini was not directly over any of these folks. They all reported to a quality manager who reported to the plant manager. Okay, when the quality manager left, then Mr. Hussaini essentially stepped in and says he spent 70 to 80 percent of his time on Hyundai, but never noticed any of these issues at the time. But all these people are peers. I mean, there's the BMW line and there's the Hyundai line, and quality engineers were absolute peers. So they are mirror images of each other in reporting and position. Okay. All right, thank you. You have some time in rebuttal still. Ms. Tietro. Good morning, Your Honors. May it please the Court, Melissa Tietro on behalf of Pyram Novi, Inc. Pyram Novi is here today to ask this court to affirm the district court's ruling, which granted summary judgment on plaintiff appellant Carmen Wannemacher Amos' claims of age, race, and sex discrimination. Wannemacher Amos brought discrimination claims because she felt she had a target on her back, but as this court has stated, she didn't know why. She testified as much. As Mr. Murphy stated, Wannemacher Amos was employed at Pyram as a quality engineer, and eventually she was given responsibility for the quality aspect of the Hyundai line. She was eventually terminated on January 10th of 2020. Do you concede that Husseini made these racist and sexist remarks? Your Honor, we do not, but at the summary judgment stage, we understand that we look at things in the favor, the light most favorable to the nonmoving party. All right, and so looking at that in the light most favorable, why doesn't that create a tribal issue here? First, there are two issues, right? So race, there is a claim that he made a statement three years before her termination, and not to her, to someone else, that black individuals were lazy. It's remote in time. It was three years before she was terminated. And opposing counsel says the remote in time piece of this doesn't matter based on the type of claim he's bringing and the argument he's making. No, that's not correct, Your Honor. The case law on McDonnell Douglas, on the pretext analysis, does look at stray remote remarks. Are they? Too attenuated. Exactly, exactly. This isn't a stray remote remark. It's a remark about this individual in the context of a conversation about her work and talking about race and work. So it seems different than those other cases which talk about stray remarks about groups of people, not the individual that's the complaining party. Your Honor, I don't believe that it was specifically about Wanamaker Amos. It was a statement. The testimony, I believe, was something about you know how those black individuals are. They're lazy, right? And so, again, it isn't directly about her. And I also think it's important to note that he didn't take any of this. I thought Sherlock testified in her deposition that Hussaini once mentioned that an appellant was not completing certain tasks and then added that comment. So it does sound like it was about her. That could be, Your Honor, and I apologize if I had that wrong. But between the time that he allegedly made that statement and the time where she was ultimately terminated, he could have done something else to evidence this alleged intentional discrimination, right? And he didn't. He instead tried to help her. He flew to South Carolina from Michigan on a regular basis to sit with her. He was the one who sat with her when this Hyundai complaint arose and drafted the response. He was the one who, again, on January 7th, when Hyundai said, I still haven't received a response, sat again with Wanamaker-Emos. Why isn't that draft response in the record? Because it was eventually sent later on January 8th. I believe that is the response. And it still did not contain this clean point serial number. But I'm not sure that answers the question as to why it's not in the record. Because there is no, quote, unquote, draft response that was saved. So the response was drafted. So the actual response is in the record, you're saying. Correct. Where is that? It is. Give me one moment, Your Honors. Who actually sent the response finally? Was it appellant or was it Hussaini? It was appellant. And after she sent that response, another nonconforming part was found. So that is why there is no documentation to that effect. Because the draft response wasn't saved as a draft that can be produced. It was eventually sent. It just wasn't sent when Hyundai required it. I want to point out that Wanamaker Amos tries to make this seem like it's a small little email. Right? She shouldn't have been terminated for not sending one email. But this wasn't a small issue. It wasn't as if she failed to send a calendar invite. This was a large customer who brought a quality concern to her on December 19th. She sat with Mr. Hussaini on that date and drafted a response, or prepared a response, how Purim was going to contain the issue. And after sending an initial quick response that same day, she didn't follow up with Hyundai. To the point where Hyundai felt they had to escalate the issue on January 7th to Hussaini. And in her briefing, Wanamaker Amos claims that Hussaini took charge of the situation. He was the one responsible for sending the response. He was the one responsible for communicating with Hyundai. But that's not true. And it's not supported anywhere in the record. In fact, Ms. Wanamaker Amos testified that if Hyundai needed a response, which they did, it was her responsibility to provide that response. This was a critical customer escalating the issue to the director of quality, the highest ranking quality official in the company. And he flew to South Carolina to sit with her and help her respond to the customer. So there were eight reasons given for her termination in that supporting evidence document. Are you only now relying on the Hyundai email and you've abandoned the other seven? We're not abandoning the other seven. Those were the evidence that Hussaini put together because he was planning to put her on a performance improvement plan. The reason for termination has been consistent throughout the case. Before the EEOC, in discovery, at the district court, and now. So he was already planning to put her on an improvement plan and then this was the final straw? Exactly, exactly. And so those issues still remained and they're good background to show that he tried to communicate with her. She had issues, quality basics failings, throughout this Hyundai program. And he tried to help her. He was planning on putting her on a performance improvement plan to help coach her. And yet when the time came to respond to Hyundai, she failed to do so. Now at the district court level, Wanamaker-Amos brought claims of age, race, and sex discrimination. And the district court properly applied the McDonnell-Douglas burden shifting analysis, which I know this court is aware of, finding that there were genuine issues of material fact as to whether or not plaintiff could establish a prima facie case. But the district court then correctly found that Piram-Novi demonstrated a legitimate non-discriminatory business reason for her termination. And it further correctly found that plaintiff could not establish pretext evidence. And now on appeal, Wanamaker-Amos does. Let me follow up. I think you would agree, though, that the response given to the EEOC as to the reason for the termination is different from the deposition testimony. I would not, Your Honor. The position has always been that, yes, there were issues leading up to this situation, but that failure to respond to Hyundai was, as Judge Thacker stated, the figurative straw. That was the catalyst for the termination decision. But when Hussain and Gabe sent the memo to the HR manager and said, terminate this individual, all eight were listed. They weren't seven and then a different one. They were just eight, right? Correct. Correct. He said, initiate action as discussed, I believe is the statement that he made. And he had talked to HR prior, as in his deposition testimony, that he needed to terminate this individual because she was putting the relationship with Hyundai at risk. It wasn't because she failed to set up safe launch or she failed to set up red box management. Those were issues that led to him wanting to coach her and put her on this performance improvement plan. But the issue that led to her termination was the failure to send the response to Hyundai. And Ms. Wanamaker-Amos did recognize that. In her deposition she stated that she was told at her termination meeting it was her failure to send an email. Now she said, I don't think it was failure to send an email. I think it was because the program had issues. But she said she was told it was the failure to send an email. And she also didn't say, I don't think it was failure to send an email. I think it was race discrimination. I think it was sex discrimination. I think it was age discrimination. She said, I think the real reason was because the program had issues. Which we don't agree with, but it still doesn't prove intentional discrimination. And I think that's evidenced by the fact that on appeal, Wanamaker-Amos focuses entirely on pretext and also abandons her age claim. Their age claim was brought at the district court level. And the pretext analysis is the same for all three claims, age, race, sex. So the pretext arguments that she's making, like she was being improperly blamed by the district court for failing to send a response, or that Purim abandoned the other seven issues in the PIP, those would apply in the exact same way to an age claim as they would to the race and the sex claim. So why did she abandon the age claim? It tells us that she thinks there's something stronger about her race claim and her sex claim. Well, isn't there something stronger? Very little, Your Honor. But yes, the differences are, one, the stray comment made more than three years before her termination, and the fact that she felt she was expected to take notes during meetings. And that's it. It wasn't just the expected to take notes. Didn't he make other comments about women, generally other derogatory comments? No, Your Honor. Calling them bitches, that's not in the record? He did not call them bitches, Your Honor. The allegation is that the women had to essentially clean up another male co-worker's mess. That male co-worker called them bitches. Ms. Schalich complained to Hosseini, and she testified that Hosseini didn't do anything. But when pressed, she said she didn't know if Hosseini did anything. She doesn't know what Hosseini did, and she admits that later that individual who made that comment was terminated. So the only evidence directed at Mr. Hosseini is that Ms. Wanamaker-Amos felt the need to take notes during meetings. And courts consistently find that these stray comments are insufficient to show pretext. Now, Mr. Murphy noted the Westmoreland case. But the Westmoreland case is a case in which the Fourth Circuit stated, looking at these stray comments from the district court, we tend to agree with the district court that they're insufficient. It wasn't a dispositive issue, and so the Fourth Circuit did not definitively decide. But there is a statement in there saying we tend to agree with the district court that these are insufficient. And I guess you keep saying stray comments, plural, but based on what you're arguing, Mr. Hosseini only made one comment, singular, it was bad, three years prior, correct? Correct, Your Honor, and thank you for that correction, because it is just one comment. So those comments may not be sufficient on their own to prove pretext, but the plaintiff put a lot of evidence into the record about pretext in response directly to the eight reasons. So isn't it the combination of the response to the eight reasons and the stray comments, it's not one or the other, it's really both? Sure, absolutely, Your Honor, and the district court did that. They looked at all of these pretext arguments in totality, and they found that most of them were misstatements of the evidence, misunderstandings of the law, and couldn't be evidence of pretext. So they looked at what could be. And again, those are the one stray comment and the fact that she felt she had to take it. What about the evidence of not following the PIP? The PIP or the policy? The policy, I guess the employee improvement policy. Sure, sure. So Mr. Hosseini was clear in his testimony that this is a manufacturing environment. He isn't someone who gives a written first warning, a second written warning. He coaches employees, he talks to them, and he treated Wanamaker Amos no differently. Is that a part of the policy, or is that just his policy? That's his policy. But that's not the company's policy. It's not, but the company's policy does allow that discretion to terminate. What's the evidence that he talked to her? She admitted as such. In her deposition, she stated that he walked to the floor with her and pointed out quality issues. In her deposition, she could not remember what those quality issues were and what the conversations were. She remembered in her affidavit. Didn't she testify that he did that once, and he testified that he did it many times? He testified that he did it many times. She remembered one instance. She didn't remember others, but that does demonstrate that at least once, and we would argue more than once, he was walking the floor with her, and he was pointing out issues. The PIP evidence also demonstrates the same thing. These are not instances where he wasn't communicating with her. There's a screenshot of a text with her. There are multiple screenshots of e-mails to her about quality issues. There's communication ongoing between the two of them. But what about this Cal Gill case? I mean, how is this different in terms of pre- I mean, they cite that for purposes of the pretext to show that there's no policy being followed by the company. And when I say policy, I mean company policy, not individual employee policy or whatever policy that they decided they're going to do. Understood, Your Honor. And the policy does allow that discretion for severe infractions. So it says that typically they will follow a progressive discipline policy. But on a case-by-case basis, depending on the severity of the infraction, you can move steps, you can jump to termination, and that's exactly what Hosseini did. So there was no- you would agree that they did not follow the progressive disciplinary policy? I would, Your Honor. You didn't? I would. But I would also say that Hosseini followed, again, his policy, which may not be the same as the company policy, but there's no evidence that he treated her differently. He treated all of the people who reported to him the same, and he coached them verbally, and he coached them in emails and in text messages, and he didn't give them written warnings. So the issue is not whether he followed the policy. The issue is whether he didn't follow the policy with her because of her race, because of her sex, and at the district court level, because of her age. And there's no evidence of that because he did that consistently with every employee. But he didn't consistently fire every employee, right? Correct, Your Honor. But there's, again, there's no evidence that any other employee committed the infraction that she had committed, which is failing to send a response that Hosseini helped her to draft to an irate customer. All she had to do was hit send, and she failed to do so. But she did send it. You said she sent it. After the fact. So she sent it- After what fact? After she was fired? Before she was fired? But after Hosseini sat with her and drafted the email, he believed that she was going to send it. Hyundai expected it that day, and the next day, Hyundai called Hosseini and said, why haven't we still received a response? At that point, he followed up with her yet again, and she sent it. But it was at that point that Hyundai was frustrated. I mean, I think Hosseini testified that they were incredibly angry. So she had already put the relationship with the customer in jeopardy at that time. Aren't these questions of fact that are in dispute? No, Your Honor. There's no undisputed question of fact as to the reason for her termination. So she testified that Hosseini sat with her and helped prepare the response. She testified that it was her responsibility to get Hyundai an answer on quality issues. She testified that if Hyundai required a response to a quality issue, it was her responsibility to provide that response. And there is no dispute that Hosseini sat with her again on January 7th, drafted the response, and she didn't send it. Those are the relevant facts as to the legitimate business reason, and they're undisputed. Now back to the Calgill case. I want to make sure that I fully address that. Because Calgill requires for a pretext finding that the company deviated from normal procedures, which it did not, that the site issues arriving previously, which he did not, Hosseini promptly addressed this issue, and that Hosseini failed to provide coaching on performance issues, which he did provide coaching on performance issues. He sat with her multiple times. He texted her. He emailed her. He walked to the floor with her. He flew from Michigan to South Carolina regularly to coach her. And now I want to state that Hosseini was not out to get her. Hosseini was not out to fire Juana MacRamos. He was there to help. He identified issues. Let me ask you about the comparators. I see your time is almost out. I asked this question earlier. So she says that she was similarly situated to these, I believe it's white males, comparators that were on the BMW line. Now did they all report to the same person? They all would have reported to the quality manager at the plant had there been one. There wasn't at this time, so they did all report to Hosseini. Okay. And it's her argument that there were a number of complaints from BMW regarding quality control issues and that none of those employees were terminated. That's correct, Your Honor. But there's no evidence in the record as to what the complaints were. There's no evidence in the record as to how the BMW employees responded to the complaints. There's no evidence in the record as to whether Hosseini directed discipline that wasn't given. There's no evidence in the record about any of that. Wouldn't that create a genuine issue of fact? No, Your Honor, because there's simply no evidence. To establish that they're similarly situated, there needs to be evidence for the court to analyze, and there simply isn't. We're just looking at is the BMW line and these quality engineers who may or may not have responded similarly, who may or may not have been disciplined, well, they weren't disciplined, who Hosseini may or may not have recommended discipline to, are similarly situated to Wanamaker Amos. And the court can't make that determination. I see my time is up. Are there no other questions? All right. Thank you very much. Mr. Murphy? I'd like to start right at where you challenged her to point into the record where this response was. She did not point to it because it does not exist, which I believe she's referring to is what's called a five panel that my client had sent, and they sent a revised five panel. Now, it's very important to understand that's not what Hyundai wanted, and the record reflects Hyundai wanted what's called a countermeasure. An example of a countermeasure is on 178 of the record. On page 163 of the record, beginning at paragraph 48, my client explains what the difference is, what's needed to create a countermeasure, that there wasn't a countermeasure to send, there couldn't have been a countermeasure to send, and Mr. Hosseini knows that. So that's why she can't point it out in the record. It never happened. He knows it never happened. She mentions about cow guilt. This case is actually more compelling than cow guilt, and I believe, Judge Sacker, it's one of your cases. In cow guilt, the person was actually put on a performance improvement plan, and this court still found that the conflicting evidence of good performance created an issue of fact. Here, there is no performance improvement plan. Now, Mr. Hosseini can say all day long, I considered putting her on one, but doesn't that admit he didn't? And doesn't all the evidence in the record that he never discussed these underlying issues? There's eight issues, you're correct, Ms. Berner, but there's a ninth lie in that document, and that is that she did something to cause significant financial damages. They ran away from that one, too. But there is, if he is claiming that he sat down and talked with her about that, look at the document itself. The key one that they want to kind of skirt all the ones and focus on this Hyundai issue. What did he put in that report about the Hyundai issue? Practically nothing. He put in an angry e-mail that he and two other white male executives got from a counterpart at Hyundai saying, guys, we requested something of you that you haven't responded to. Carmen Wanamaker Amos is not on that e-mail, and she says in her declaration, if there were other conversations going on, I didn't know about it. And please remember, that document we're talking about, the PIP document, draft PIP where he says fire her, we didn't see that until litigation discovery. She didn't know it existed. Nobody ever showed it to her. Nobody ever showed her that e-mail. Nobody ever gave her a chance to respond to any of this. But it doesn't show, hey, Carmen's not doing her job. They're saying, hey, Hosseini, you and your two cohorts, you're not doing your jobs. So that is not evidence. As to him sitting down and coaching her, that is not what the record says. She says, well, of course, over time we discussed quality issues. Well, you would expect that. But she has been adamant from day one as we go down through the eight main areas. These were never discussed as issues. In fact, Hosseini agrees with that at some points. For example, on the control report, the PFMEA issue, he says, well, she didn't make changes to it. She wasn't even employed on this project when that happened. But when I questioned him, I said, wait a minute, you asked her for something. She sent it to you in an e-mail. Right. And you never told her you had a problem with the e-mail or anything. She sent an e-mail. That's right. Is there evidence in the record as to when that document was drafted? The PFMEA. No, the PIP document, the document with the list of reasons. There isn't. The only time we ever see that, and that's a good point, the only time we ever see that is in the context of fire her. There is no earlier draft to show he was working on this in November. There's no draft to show. Was he asked about it in his deposition? I don't know if he was specifically asked about that because he testified in his deposition that the e-mail sending that, it says, please initiate the action discussed. And he said, yeah, the action discussed was termination. It wasn't please put her on this PIP. So do we know how that list was put together? No. Judge, she never saw it. She didn't know these were issues. When they fired her, they never told her. Understand from her perspective, she's coming to work, she's getting nothing but attaboys. Now, she knows Hosseini has been trying to get her fired for years, but she's got nothing but attaboys. She's working on a problem with Hyundai, which is really not a remarkable problem or different from the other problems she's ever dealt with. Did she say that in her deposition, that Hosseini was trying to get her fired for years? She knew about the phone call, and her boss told her. I guess, okay, so my question was, did she say in her deposition that she knew Hosseini was trying to get her fired for years? I don't know if she used the exact words, but she did say she knew about that because her boss has told her that as long as I'm here, you're protected. Okay? Everybody knew Hosseini was out to get her, and everybody knew why. And they weren't going to let it happen. To Purim Novi's credit, most of its management, none of whom will stand behind them at this point, they tried to protect this woman for one reason and one reason only. She did a great job. She was the best. Let me follow up on this comparator question that I asked her. She said that there is no evidence in the record to support that the BMW side was treated any differently from a performance, I guess, corrective performance standpoint. Well, you can only make that argument if you change what he said. What he says is, I want her fired. She's causing complaints. Okay? So that's what I address in discovery. I say, oh, it's complaints, is it? Okay, let's see the BMW records because we knew what was going to be in them. Okay, she works in the plant. And the BMW complaints, as you saw, I mean, there'd be a dozen or a couple dozen in a weekend. She had two the entire time. But were there any, in those records, is there any corrective action that's taken against any of the employees on the BMW side? They agree that there's never been corrective action issued for any of them. And the 30B6 witness testified, no, there was no discipline. And he says, we don't discipline for that. Well, they do when it's a black woman. For her to say that she was treated no differently than anybody else really ignores one of the fundamental facts. She was treated differently than everybody else, and she was the only black woman there. So, you know, to say that it has to be specific as to a response to a complaint, that was not what Mr. Hosseini said. That's something that's added on. I don't even know that it was argued in summary judgment. That's something the district court tried to make a distinction on. Well, I can't. Did that answer your question, Judge Benjamin? Do you have any other questions? All right, thank you. Thank you. All right, we're going to come down and greet counsel, and then we'll take a short break before our final case. This honorable court will take a brief recess.
judges: Stephanie D. Thacker, DeAndrea Gist Benjamin, Nicole G. Berner